UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RODNEY WHITE,

        Plaintiff,

v.                                                         Case No. 19-C-946

FINCANTIERI BAY SHIPBUILDING, et al.,

        Defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Rodney White brought this action against Defendants Fincantieri Bay Shipbuilding, Fincantieri Marine Group LLC (collectively, Fincantieri), Keystone Shipping Co., and Wawa Inc. White alleges he sustained significant injuries while working aboard a vessel on Lake Michigan as it was undergoing sea trials. The Court previously dismissed White's claims under the Jones Act, 46 U.S.C. § 688, general maritime tort law, and Wisconsin common law negligence, leaving White's negligence claim under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b). The case is before the Court on Defendants' motions for summary judgment. Dkt. Nos. 74–76. For the following reasons, summary judgment will be granted in favor of Keystone and Wawa. Fincantieri's motion, however, will be denied.

### BACKGROUND

In February 2016, Fincantieri Bay Shipbuilding and Wawa Inc. entered into a contract for the construction of an articulated tug/barge vessel. Dkt. No. 74 at 25. The contract identifies Fincantieri as the builder of the vessel and Wawa as the owner but notes that legal title of the completed vessel, the *Millville*, would not pass to Wawa until successful completion of "sea trials"

and delivery of the vessel. *Id.*; Dkt. No. 93 at 6; Dkt. No. 74-3 at 13. These sea trials are designed to "put the newly constructed vessel through a series of proving exercises to confirm that the vessel conforms to the technical specifications to which the vessel was to be built." Dkt. No. 74 at 25. Per the terms of the shipbuilding contract, the builder, Fincantieri, was to carry out the sea trials. *Id.* at 26; Dkt. No. 93 at 29. Wawa, however, was to provide the crew for the sea trials and reached out to Keystone to obtain a crew for the trials. Dkt. No. 80-12 at 7–8. Ultimately, a crew headed by Captain Buddy Davis was secured for the sea trials, although the crew was employed by non-party Key Marine, LLC, rather than by Keystone. Dkt. No. 74-5 at 7–9. Key Marine was to become the bareboat charter of the *Millville* upon its delivery. Dkt. No. 74 at 26.

In November 2017, the sea trials of the *Millville* were commenced. White participated in the sea trials by virtue of his employment with Engine Motors, Inc., and was primarily responsible for monitoring the performance of the vessel's steering control systems and troubleshooting any issues. Dkt. No. 74 at 28. During the sea trials, a number of maneuvers were to be conducted, including "hard-over" maneuvers. *Id.* at 27. A hard-over maneuver "calls for sailing the vessel on a level course, turning the rudder full over to one side, followed by turning the rudder back full over to the other side, then back to center." *Id.* This maneuver causes the vessel to roll side-to-side to allow the crew to measure the vessel's stability when turning, and takes the vessel to its "operational limits, to see if the vessel can operate at the extremes, and to ensure that, should something go wrong, it happens before the vessel is completed as opposed to during her service." *Id.* Prior to the execution of the sea trials and the hard-over maneuvers, a series of safety meetings were held, including a meeting that was held on the main deck of the *Millville* the morning of the trials. Dkt. No. 80-11 at 37. White attended this safety meeting and acknowledged that the

meeting informed him of the agenda for the sea trials and the fact that hard-over maneuvers were going to take place. *Id.*

The morning of the trials, White conducted a "dock side trial," verifying that the "material was all right and that the captain approved." *Id.* at 10. After verifying that the steering system was satisfactory, White testified that he "went down to the rudder room to make sure that there were no leaks" and then "probably went to the gall[e]y," although he acknowledged he could have been in the wheelhouse or engine room. *Id.* at 23–24. What happens next is the heart of the dispute. As the vessel approached the trials area, an initial announcement was made informing those on board that the vessel was approaching the trials area and that personnel should secure any loose belongings and prepare for hard-over maneuvers. *See, e.g.*, Dkt. No. 74-10 at 17–18; Dkt. No. 80-10 at 11; Dkt. No. 80-7 at 22. Beyond this, the testimony varies regarding the warnings.

Amelia Ott, the project manager for the construction of the *Millville*, testified that, as part the safety announcements, personnel on board were instructed that "maneuvers were going to be ongoing and that they would not be completed until another announcement was made." Dkt. No. 80-15 at 14. Ott further testified that those who made the announcements informed personnel that, although "there may be brief pauses where [the personnel] believe that we may be complete," the maneuvers would not truly be complete until there was an announcement confirming that the maneuvers were actually finished. *Id.* Ott was the only one who testified that such a detailed warning took place. An electrician who was aboard the vessel at the time of the trials, Jan Hucek, stated that, after some hard-overs had been completed, he and those in the galley and mess area thought the maneuvers were finished. Dkt. No. 80-7 at 18. The boat had "come back to straight," but after a couple of minutes, another hard-over was allegedly initiated without warning. *Id.*

3

At some point during the hard-over maneuvers, White was injured after sliding into the "starboard wall in the mess room, outboard," leaving a dent in the wall. Dkt. No. 80-8 at 3; Dkt. No. 80-7 at 21. White testified that, while he had heard the initial announcement concerning the vessel approaching the trials area and to prepare for hard-over maneuvers, there had been no announcement just prior to White's initial injury. Dkt. No. 80-11 at 27–28, 41. As a result of White sliding into the wall, White suffered various injuries, including a herniated cervical disc and closed head injuries (a traumatic brain injury). Dkt. No. 1 at 6.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

White's sole remaining claim in this cause is brought under § 905(b) of the LHWCA, which reads:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b). In short, Section 905(b) allows the exclusive remedy for maritime torts to be asserted against vessels, which means "any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21).

In *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981), the United States Supreme Court recognized the duties owed to longshoremen under § 905(b). The first is the "turnover duty," which provides that a shipowner must, prior to turning the ship over to a stevedore, "exercise ordinary care to have the ship and its equipment in a reasonably safe condition" and warn the stevedore of "any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it, that would likely be encountered by the

5

stevedore . . . and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1150 (7th Cir. 1992) (citing *Scindia*, 451 U.S. at 167) (internal quotation marks omitted). The second is the "active control duty," which requires a shipowner to exercise due care to "avoid exposing longshoreman to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel." *Id.* The third duty, "the duty to intervene," arises when the shipowner has "actual knowledge of a dangerous condition which has arisen after the turning over of the ship to the stevedore." *Id.*

White contends that the *Scindia* duties only apply when a vessel has been turned over to an expert stevedore, a circumstance not present here. But courts have consistently held that the *Scindia* duties are not limited to stevedoring operations. *See, e.g.*, *Hudson v. Schlumberger Tech. Corp.*, 452 F. App'x 528, 532 (5th Cir. 2011) (holding that *Scindia* is not limited to the stevedoring context); *Levene v. Pintail Enters., Inc.*, 943 F.2d 528, 533 (5th Cir. 1991) ("We have held that although *Scindia* arose in the context of stevedoring operations, the duties it enumerates are not limited to stevedores."); *Cook v. Exxon Shipping Co.*, 762 F.2d 750, 752 (9th Cir. 1985) ("We agree with the Fifth Circuit that there is no reason to limit the Supreme Court's holding in *Scindia* to stevedores."). Therefore, the Court finds it appropriate to apply the *Scindia* duties to this case.

White maintains that Defendants violated the active control duty. He argues that the vessel may be held liable "for injury caused by hazards under the control of the ship." *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 15 (5th Cir. 1992). Essentially, White's argument is that the alleged abrupt hard-over maneuvers were a hazard under the control of the ship and that, had White been warned of each hard-over maneuver, he would not have been injured. White claims that Defendants breached their duty of care by failing to warn of each impending hard-over maneuver

6

and ultimately causing injury to him in violation of § 905(b). Each of the defendants has filed a motion for summary judgment asserting that they either are not a covered entity under the statute or did not violate a duty owed to White. The Court will examine each motion in turn.

**A. Keystone Shipping Co.'s Motion for Summary Judgment**

Keystone argues that it is not among the class of entities that may be held liable under § 905(b) of the LHWCA. Under that section, a "vessel," as well as the vessel's "owner, owner pro hac vice, agent, operator, charter or bareboat charterer, master, officer, or crew member" are subject to liability for negligence. 33 U.S.C. § 902(21). Keystone maintains that it is not a covered entity, noting that it did not play a role in drafting the shipbuilding contract, did not have any involvement in the construction of the vessel, did not conduct any meetings prior to the sea trials, did not set the agenda for the sea trials, and did not collect any data as part of the sea trials. Dkt. No. 74 at 10. Furthermore, Keystone explains that Captain Davis and the crew aboard the vessel were employees of non-party Key Marine, LLC, the company that eventually became the bareboat charterer of the vessel upon its delivery. *Id.* at 11. This is corroborated by deposition testimony from Joe Wassel, the Vice President and Treasurer of Chas. Kurz & Co., Inc., the parent company of Keystone and Key Marine. Dkt. No. 80-13 at 2–3, 11–12. Keystone further notes that it had no operational role with respect to the vessel at the time of the sea trial. Dkt. No. 74-4 at 8. In essence, Keystone contends that White sued the wrong party.

White asserts that Keystone was the operator of the vessel, such that it may be held liable for any negligence on its part. White first points to Keystone's brief in support of its motion for partial judgment on the pleadings, Dkt. No. 27, where the motion states "[i]n its answer, Keystone admitted that it was the operator of the *T/V Millville* and that it was a subsidiary of Chas. Kurz." *Id.* at 3. A review of Keystone's answer, however, reveals that Keystone specifically denied being

7

the owner or operator of the vessel "at the time of the sea trials or even after the vessel's delivery." Dkt. No. 3 at ¶ 17. This should have been enough to put White on notice that its allegation to the contrary was in dispute.

White also claims that Keystone "brags on its website that it is the operator" of the vessel, Dkt. No. 80 at 15, but a viewing of the website reveals that Keystone merely states that it "manages" the vessel, not that it is the operator, or more importantly, that it operated the vessel at the time of the sea trials. *See Keystone Shipping Managing the New ATB for Wawa, Inc.*, KEYSTONE SHIPPING CO. (Jan. 25, 2018), http://www.keyship.com/keystone-shipping-managing-the-new-atb-for-wawa-inc/. White has not established that Keystone was the operator of the vessel at the relevant time.

Though he does not use the phrase, White's argument raises the question of whether Keystone should be judicially estopped from denying that it was the employer of the crew that operated the vessel during the sea trials it underwent. The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000). White suggests that, having successfully moved for judgment on the pleadings on his state law claims by asserting it was the operator of the vessel, Keystone is estopped from now taking the position that it was not the operator. Judicial estoppel does not apply here, however, because Keystone did not prevail on the motion for judgment on the pleadings by convincing the Court it was the operator; instead, Keystone, like the other defendants, prevailed on their motion because White alleged his injury occurred on a vessel while he was engaged in maritime employment, thus making the LHWCA his exclusive remedy. Given this fact, Keystone was entitled to dismissal of White's state law claims regardless of whether it was the operator of the vessel. Moreover, in

deciding a motion for judgment on the pleadings, the Court assumes the version of the non-movant to be true. In light of White's allegation in his complaint that Keystone was the operator, Keystone's assertion of the same in its brief was therefore immaterial to its motion. Under these circumstances, judicial estoppel does not apply.

Next, White asserts that Keystone and Key Marine are a joint enterprise under Wisconsin law, such that Keystone may be held liable for the alleged negligence of Key Marine. To constitute a joint enterprise under Wisconsin law, a party must show "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.*, 791 F. Supp. 2d 626, 636 (E.D. Wis. 2011) (citing *Spearing v. Bayfield Cty.*, 133 Wis. 2d 165, 173, 394 N.W.2d 761 (Wis. Ct. App. 1986)). Without addressing these elements, White makes the conclusory assertion that "Keystone Shipping Co. and Key Marine are clearly a joint enterprise under Wisconsin law." Dkt. No. 80 at 17. White maintains that (1) Keystone is a wholly owned subsidiary of Chas. Kurz & Co., Inc.; (2) Key Marine is a single-member entity owned by Chas. Kurz; (3) there is a management agreement between Keystone and Key Marine; (4) Key Marine has no office personnel and Keystone Management Group handled all contracts and communications with Wawa for supplying a crew; (5) Key Marine was only incorporated in association with its dealings with Wawa and the vessel; and (6) there is conflicting deposition testimony as to whom Captain Davis worked for. *See* Dkt. No. 80 at 15–17.

White has failed to show that a joint enterprise exists. Although the companies have a management agreement, White has not established that Keystone and Key Marine have "an equal

9

right to a voice in the direction of the enterprise, which gives an equal right of control" or that there is any "community of pecuniary interest" between the parties. *Johnson Controls*, 791 F. Supp. 2d at 636. White does not offer evidence to show what level of control each party may have had with respect to the arrangement or that the parties had a shared financial agreement. While Keystone and Key Marine are companies under the control of Chas. Kurz & Co., Inc., that fact alone is insufficient to permit a finding of a joint enterprise. *Id.* at 637. In sum, White has failed to put forth sufficient evidence to establish the existence of a joint enterprise. The undisputed evidence demonstrates that Keystone was not involved with the sea trials, with the exception of Port Captain Erica Hubbard who was merely on board to serve as a "shoreside representative" of the management team. Dkt. No. 80-12 at 6. The Court therefore concludes that Keystone is not a covered entity under § 905(b).

Relying on *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 292–93 (5th Cir. 2008), White contends that, in the event his § 905(b) claim against Keystone is dismissed, his state law and general maritime law claims must be reinstated because § 905(b) is no longer the exclusive remedy in this case. But *McLaurin* held that state law claims are available when no claim exists under § 905(b). *Id.* at 292–93. In that case, the § 905(b) claim failed because the injury did not occur in navigable waters. *Id.* at 291. Here, there is no dispute that the injury occurred in navigable waters and thus the LHWCA applies. The § 905(b) claim against Keystone is dismissed not because the Act does not apply, but because Keystone was not an operator of the vessel at the time of the injury.

Even if the state law claims were reinstated, the result would be the same. Keystone would be entitled to summary judgment. The only Keystone representative aboard the vessel during the sea trials was Port Captain Erica Hubbard, and White does not assert that Hubbard committed any

10

negligent act during her time on the vessel. Indeed, White's claim against Keystone is predicated on the alleged negligence of Captain Buddy Davis, who, as the Court has already discussed, is an employee of non-party Key Marine. Therefore, White has not established that Keystone was negligent under Wisconsin or maritime law. Keystone's motion for summary judgment must therefore be granted.

### B. Fincantieri's Motion for Summary Judgment

The Fincantieri Defendants have also moved for summary judgment, primarily arguing that White has failed to demonstrate that Fincantieri has breached any duty owed to him. White argues that Fincantieri, as the entity responsible for conducting the sea trials, was in control of the *Millville* during the trials and was responsible for making the safety announcements during the sea trial, such that its alleged failure to make additional safety announcements prior to each hard-over maneuver constitutes a breach. Because the Court concludes that there are genuine disputes of material fact with regard to White's claim against Fincantieri, Fincantieri's motion for summary judgment will be denied.

White seeks to hold Fincantieri liable under § 905(b) of the LHWCA for violating the active control duty. As an initial matter, Fincantieri is part of the class of entities under § 905(b) because it was the owner of the vessel at the time of the sea trials. Fincantieri retained title to all work, materials, and equipment until Wawa took delivery and became the owner. Dkt. No. 93-1 at 6, 30. Fincantieri argues that White has failed to show that it breached any duty owed to White because Fincantieri was not operating the *Millville* during the sea trials; the sea trial booklet and sea trial agenda created by Fincantieri have not been called into question; and there was no contract provision, positive law, or custom that created rights or obligations owed by Fincantieri to White. Dkt. No. 87 at 3–4. Furthermore, Fincantieri argues that it satisfied any duty owed to White

11

because it is undisputed that at least one announcement occurred prior to the beginning of the hard-overs, and there is testimony that additional announcements were made during the sea trials. The mere fact that White did not hear these announcements, Fincantieri argues, is not sufficient to demonstrate negligence on its part. Dkt. No. 87 at 4.

White argues that Fincantieri was responsible for conducting the sea trials, that the trials were conducted at Fincantieri's sole risk and expense, and that the safety announcements were made by either Amelia Ott, Fincantieri's program manager; Steve Propsom, Fincantieri's project manager; or Captain Davis, the master of the ship. Dkt. No. 81 at 6. The fact that Fincantieri conducted the sea trials and was responsible for the agenda and making announcements, White claims, is sufficient to demonstrate that Fincantieri actively controlled the *Millville* during the sea trials, such that it is liable for failing to warn of each hard-over maneuver. *Id.*

Fincantieri, as owner of the vessel, may be held liable for "for injury caused by hazards under the control of the ship." *Pimental*, 965 F.2d at 15. In this case, the impending hard-overs were hazards under control of the ship. The question, then, is whether Fincantieri breached its duty to "avoid exposing [White] to harm" from the hazard by failing to make additional announcements before each hard-over maneuver. *See Elberg*, 967 F.2d at 1150. Captain Richard DiNapoli, an expert in this case, agreed that announcements as to the impending effort to conduct hard-overs should be made to the people on board the vessel. Dkt. No. 80-5 at 10. He opined that the best way to make announcements would be to "do the general one to start, the[n] one at each iteration, and then . . . one at the end of the whole thing and say, okay, we're done with all these." *Id.* at 15. Although Captain DiNapoli did note that, if he was dealing with people who had

12

participated in sea trials before, it may be possible to "get away with" a single general announcement, he continued to say that "that's not the way I would do it." Dkt. No. 85-2 at 3.

Aside from Captain DiNapoli's testimony, there is a variety of conflicting testimony as to whether additional announcements occurred, who made the announcements, and the substance and timing of the announcements. For example, Amelia Ott testified that an initial warning "instructed that maneuvers were going to be ongoing and that they would not be completed until another announcement was made and that there may be brief pauses where you believe that we may be complete, but until that announcement is made . . . [the maneuvers] are still ongoing." Dkt. No. 74-3 at 11. It does not seem that anyone else recalls this more detailed announcement. She also testified that multiple announcements were made at various times, by either herself, Steve Propsom, or Captain Davis, Dkt. No. 74-8 at 11, but she could not recall whether any announcements were made "with regards to hardover maneuvers." *Id.* at 17.

As to the other personnel on board, Jan Hucek testified that he recalled an initial announcement to secure items, and then another announcement "right before [the hard-overs] were going to start." Dkt. No. 80-7 at 22. He further testified that he and those in the galley thought maneuvers had finished, but after several minutes the vessel suddenly initiated another hard-over without warning. *Id.* at 18–19. Lee Ahlswede testified that he heard the first announcement, but he did not know exactly when the hard-over was coming because the announcement was not made immediately prior to the start of the maneuver. Dkt. No. 80-8 at 6. Jason Sullivan testified that he heard an initial announcement, but he was not sure who made it, and all Sullivan could recall was that there was more than one announcement made regarding the hard-overs during the sea trial. Dkt. No. 80-10 at 12, 14, 19. White testified that the only announcement he heard prior to his

injury was the initial announcement that the vessel was approaching the trials area and that personnel were to prepare for hard-overs. Dkt. No. 80-11 at 28, 33–34, 41.

Based on this conflicting testimony as to whether additional warnings occurred prior to each hard-over, who made the announcements, and what the substance of each warning was, the Court concludes that there is a genuine dispute of material fact as to whether Fincantieri breached its duty to avoid exposing White to harm from the active hazard of the hard-over maneuvers. Fincantieri, in general, takes issue with White merely stating that he could not recall the announcements, arguing that the fact that White did not hear them does not necessarily mean the announcements did not occur. But the testimony of other crew members and the reasonable inferences that can be drawn from the facts are sufficient to support a finding that no warning was given before the hard-over that resulted in White's injury. If the announcements occurred and White simply did not hear them, then Fincantieri could not be considered negligent. However, if the announcements did not occur at all, then it is possible that Fincantieri may have breached the active control duty.

Finally, Fincantieri argues that White's injury was due to his own failure to avoid an inherent risk in his work, and thus, it cannot be held liable for White's injury. But the Court finds that this argument is misplaced, especially in the context of a claim premised on an active control violation, because it is "no defense that the hazard was open and obvious." *Romero v. Cajun Stabilizing Boats Inc.*, 307 F. App'x 849, 851 (5th Cir. 2009). If the risk was so inherent in White's work, there would have been no need for Fincantieri to make any announcements at all, but Captain DiNapoli testified that announcements are required prior to initiating hard-over maneuvers, Dkt.

14

No. 80-5 at 10, and Fincantieri cannot escape this responsibility by claiming that the risk was inherent in White's work. Therefore, Fincantieri's motion for summary judgment will be denied.

### C. Wawa, Inc.'s Motion for Summary Judgment

Wawa has moved for summary judgment on the ground that White cannot establish that Wawa violated any of the duties it may have owed him under § 905(b) of the LHWCA. Dkt. No. 77 at 1. Wawa notes, in any event, that it did not owe a duty to White under § 905(b) because it did not become the owner of the *Millville* until after the sea trials were completed. *Id.* at 2. White maintains that Wawa is liable under the "borrowed servant doctrine" because Wawa provided the crew for the sea trials and the negligence of the crew may be imputed to Wawa as the "employer of the master." Dkt. No. 82 at 4. White seeks to hold Wawa liable for the allegedly negligent acts of Captain Davis, who White asserts was one of the individuals responsible for making safety announcements during the sea trials and failed "to make clear and proper announcements as to the maneuvers that were performed during the sea trial." *Id.* at 6–7.

The borrowed servant doctrine "provides that 'an employee directed or permitted by his employer to perform services for another principal may become the employee—i.e., the borrowed servant—of the borrowing principal in performing those services.'" *Holder v. Fraser Shipyards, Inc.*, 288 F. Supp. 3d 911, 939 (quoting *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1122 (11th Cir. 2011)). In determining whether Captain Davis was the borrowed servant of Wawa, the Court may consider the following factors:

> 1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> 2) Whose work is being performed?
> 3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> 4) Did the employee acquiesce in the new work situation?
> 5) Did the original employer terminate his relationship with the employee?
> 6) Who furnished tools and place for performance?

15

> 7) Was the new employment over a considerable length of time?
> 8) Who had the right to discharge the employee?
> 9) Who had the obligation to pay the employee?

*Id.* at 940 (citing *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 616–17 (5th Cir. 1986)). Although no factor is determinative, control is the most important. *Id.* The borrowed servant doctrine is a question of law, but factual disputes relating to each element may need to be submitted to the factfinder. *Id.* at 941.

Considering the factor of control first, the Court concludes that Wawa did not have control of Captain Davis. Wawa was required to supply the crew for the sea trials, and it contracted with Keystone to provide the crew. Captain Davis, who was part of the crew, was employed by Key Marine. Wawa had no role in specifically choosing Captain Davis, did not specify the manner and means by which Captain Davis was to conduct the trials, and did not direct or advise Captain Davis as to what maneuvers were to be performed or how they were to be performed. Dkt. No. 88 at 5; Dkt. No. 89-2 at 4–5. Wawa and Captain Davis had no direct communication during the sea trials. Dkt. No. 89-3 at 3. Instead, Fincantieri provided instructions to Captain Davis, *id.* at 4, and Captain Davis made individual decisions if he felt that something was unsafe for the vessel or the personnel on board. Dkt. No. 89-2 at 11. In short, Wawa did not have sufficient control of Captain Davis such that he could be considered a borrowed servant of Wawa.

As to the remaining factors, Captain Davis' employment was not over a "considerable length of time," such that it would support a finding of borrowed servant status. Indeed, Captain Davis was merely called on to serve as the master of the sea trials; he was not in the role for weeks or months, such that it could be considered a lengthy period of time. In addition, Wawa did not directly pay Captain Davis for his services. *Id.* at 8. Finally, because Wawa was not to be the owner of the vessel until completion of the sea trials, Wawa did not furnish Captain Davis with

tools and a place for performance. Fincantieri provided the vessel, created the sea trial booklet, and was responsible for conducting the sea trials. Dkt. No. 82 at 6. Although Wawa was responsible for providing the crew, it was not responsible for any of the finer details of the sea trials, and thus, cannot be said to have provided the tools or place for performance. The Court concludes that Captain Davis was not a borrowed servant of Wawa. Accordingly, Wawa did not have a duty to White under § 905(b), and Wawa's motion for summary judgment is granted.

## CONCLUSION

For the reasons set forth above, Keystone's motion for summary judgment (Dkt. No. 74) is **GRANTED**. White has failed to establish that Keystone was operating the vessel at the time of the sea trials and has further failed to provide any evidence to establish negligence under either state or general maritime law, such that those claims could proceed. Wawa's motion for summary judgment (Dkt. No. 76) is also **GRANTED**. White has failed to provide sufficient evidence to establish that Captain Davis was a borrowed servant of Wawa. Finally, the Fincantieri Defendants' motion for summary judgment (Dkt. No. 75) is **DENIED**. The Court concludes that genuine disputes of material fact remain as to the occurrence, substance, and timing of the announcements regarding the hard-over maneuvers.

**SO ORDERED** at Green Bay, Wisconsin this 2nd day of November, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge